´11173

STATE v. BIGHAM

(117 S. E., 57)

1. CRIMINAL LAW—EVIDENCE WHICH COULD HAVE BEEN PRESENTED AT TRIAL NOT NEWLY DISCOVERED.—On a motion for a new trial on the theory of newly discovered evidence, evidence which could have been presented at the time of the trial was not newly discovered.

2. CRIMINAL LAW—FINDING THAT DEFENDANT KNEW OF EXISTENCE OF ALLEGED NEWLY DISCOVERED EVIDENCE HELD AUTHORIZED.—On a motion for a new trial based on the theory of newly discovered letters, where these letters were received by defendant, finding that defendant knew of their existence at the time of the trial *held* authorized.

3. CRIMINAL LAW—TRIAL JUDGE'S FINDING OF FACT NOT ·REVIEWABLE IN ABSENCE OF ABUSE OF DISCRETION.—Where it was not shown that there was an erroneous exercise of discretion, the question whether a finding of fact on motion for new trial was against the weight of the evidence is not properly before the Supreme Court.

4. CRIMINAL LAW—ON MOTION FOR NEW TRIAL ON THEORY OF NEWLY DISCOVERED EVIDENCE, TESTIMONY INTRODUCED AT TRIAL CONSIDERED. —The question whether the trial Court's discretion was erroneously exercised in denying a motion for a new trial on the ground of after-discovered evidence, must be determined, not only on the testimony heard on the motion, but also on the testimony introduced at the trial.

Before SHIPP, J., Florence. Affirmed.·

Edmund D. Bigham was convicted of murder. From a denial of a motion for a new trial on after-discovered evidence the defendant appeals.

This is the second appeal herein, and is from the following order of his Honor, Judge Shipp:

"This matter comes before me upon motion of defendant for a new trial upon newly discovered evidence.

"The defendant was convicted upon an indictment at the spring term, 1921, of this Court, for murder of L. Smiley Bigham, and was sentenced to death in the manner provided by law. He appealed to the Supreme Court, where the sentence below was affirmed and the cause remanded to this

Court for the purpose of assigning a new day for the execution of the sentence. I have carefully considered the record in the case and the argument of counsel, and I am not satisfied that the alleged new evidence would probably change the result.

"In so far as the letters are concerned, these were known to the defendant at the time of the former trial, and hence cannot be said to come within the requirements of the law as to after-discovered testimony. There was a failure to exercise proper diligence as to the letters. It was the duty of defendant to make known to his counsel the existence of such evidence if he desired to avail himself of it.

"As to the other paper alleged to have been signed by L. S. Bigham and undated and unaddressed, I find the same is not the signature of L. S. Bigham, the deceased. If genuine, I hold that the paper would be admissible in evidence; but, even if admitted, I do not believe that the result of the trial would be different in view of the entire evidence in the case.

"The motion is therefore overruled and refused."

. The exceptions are as follows:

"(1) That the presiding Judge committed error of law in failing and refusing to permit the appellant to introduce the evidence offered through the chief of police of the said City of Florence, in that:

"(a) The evidence offered being in the nature of a physical fact, which was unknown to defendant or his counsel at the time of the trial, was 'after-discovered.'

"(b) It was both material and relevant in that it tended to completely overcome one of the main circumstances relied upon by the state to establish its case.

"(2) That the presiding Judge committed error of law in ruling that the letters presented by the defendant were known to be in existence at the time of the former trial, in that there was no evidence whatsoever before the Court to sustain such ruling, but, on the contrary, all of the evidence

clearly established that neither the defendant nor his counsel knew of the existence of the said letters at the time of the former trial.

"(3) That the presiding Judge did err and fail to exercise a sound judicial discretion in his finding that the unaddressed and undated paper alleged to have been signed by. L. S. Bigham was not signed by said party, in that such finding was contrary to the overwhelming weight of the evidence presented to him.

"(4) That the presiding Judge did err and fail to exercise a sound judicial discretion in his finding that the motion for a new trial, on the ground that the evidence presented by appellant would not probably change the result, in that such evidence was plainly and manifestly of such a nature and character as to completely overcome the state's case.

"(5) That the presiding Judge did err in overruling appellant's motion for a new trial, in that he did thereby plainly and manifestly fail to exercise a sound judicial discretion, because: ·

"(a) The evidence presented to him was new matter.

"(b) It was both material and relevant.

"(c) It was clearly established by appellant that his failure to produce it at the former trial was not due to a lack of diligence.

"(d) It was plainly and manifestly of such a nature and character as to completely overcome the state's case, and thereby change the result of the former trial."

The following statement appears in the record:

"The defendant swore the Chief of Police of the City of Florence, S. C., and undertook to prove by him that he had on the said day made a test to demonstrate the effect of a pistol shot, particularly as to powder burns on a man's face, where the pistol was held up against such face. He was prepared to swear that he took a pistol of similar size and caliber, as the pistol that was found in the hands of L. S.

Bigham when his body was found, and loaded the same with black powder and fired it against a newly killed hog's head, and that while there was a stain on the skin, caused by the smoke from the explosion, this stain washed off easily, and there were no powder burns left, except in the wound and immediately around the edges thereof.

"The Court refused to hear this evidence, ruling that it was not 'newly discovered' but could have been presented at the time of the trial.

"The defendant presented the following affidavit, to wit (caption and jurat omitted) :

"Personally appeared before me, A. L. King, who, being duly sworn, says that as attorney of record for Edmund D. Bigham, in the Court of General Sessions for Florence County, state aforesaid, and against whom a verdict of guilty was found and sentence of death was passed upon said E. D. Bigham, there has come into his possession and to his knowledge certain evidence which has been discovered since the said trial, and that he verily believes that if this said evidence had been adduced at the said trial, it would have changed the verdict in the said case.

" 'Deponent further swears that he used all due diligence to obtain and present all the evidence on behalf of defendant during the said trial that came to his knowledge, and that the failure to produce the new evidence referred to in this affidavit was due to no fault of deponent nor to any fault of defendant, so far as deponent is informed and believes.

" 'Deponent further swears that the said after-discovered evidence consists of certain letters, a written statement, post card, and facts, which said letters and statement are attached to these proceedings and made a part and parcel thereof; the said facts being set out in certain affidavits attached to these proceedings and made a part thereof.

" 'Personally appeared before me Edmund D. Bigham, who, being duly sworn, says *that he, while residing in South Georgia, received from his brother, L. Smiley Bigham, a*

*series of letters, typewritten, and signed with pen·and ink,* *"L. S. Bigham," bearing dates January* 3, 1917, *January* 12,.1917, *July* 1, 1918, *June* 10, 1918, *September* 29, 1918, *October* 12, 1918, *October* 23, 1919, *May* 5, 1920, *June* 1, 1920, *July* 12, 1920, *August* 20, 1920, *and October* 29, 1920; *that said letters were received in due course by mail; that not thinking that the said letters were or ever would be of any particular importance, he made ₥no special effort to preserve them,* and is informed and believes that they were found in some drawer or receptacle in some of his household furniture which was packed some time during the month of November, 1920, and shipped to Pamplico, S. C., and which was not unpacked, according to his information and belief, until some time during the past winter or spring, at which time, he is informed and believes, the said letters were found by his wife, May M. Bigham, while going through said household effects, and that on the annexed sheets copies of the said letters are set out.

" 'Personally appeared before me Mrs. May M. Bigham, wife of Edmund D. Bigham, who, being duly sworn, says that the household furniture belonging to herself and her husband, which had been in use by them in their home in South Georgia, was, according to her information and belief, packed at the said home, under the direction of her husband, some time after she and her children had left the said home, and was shipped to Pamplico, S. C., and a portion of the same was stored, unpacked, at what is known as the "Copeland House" on the said plantation; that the said furniture remained in the said house, unpacked, until a month or so after the trial of her husband in the Court of General Sessions for Florence County at the spring (1921) term, when it was shipped to Taylors, S. C.; that it remained unpacked until some time during the month of December or January, last, when certain pieces were sold by her, at which time the drawers were cleared out; that the contents of the said drawers were not carefully exam-

ined by her until some time during the month of March;
that while examining the said contents of the said drawers,
she found certain letters bearing dates as follows, to wit,
January 3, 1917, January 12, 1917, June 10, 1918, July 1,
1918, September 29, 1918, October 12, 1918, October 23,
1919, May 5, 1920, June 1, 1920, July 12, 1920, August
20, 1920, and October 29, 1920, all typewritten and bear-
ing the signature of L. S. Bigham.

" 'Deponent further swears that her husband requested
her, prior to his trial, to look for these letters, and that she
made a careful search for them, but that she was unable
to find the said letters.

" 'Deponent further swears that she sent the said letters
to A. L. King, by registered mail, as attorney for said E.
D. Bigham.

" 'Personally appeared before me May M. Bigham, who,
being duly sworn, says that she was residing at the Bigham
home near Pamplico, S. C., some time prior to the time
when L. Smiley Bigham and the other members of the Big-
ham family met their death, and continued to reside there
until the time of the death of said parties; that she went back
and forth to the said home for some time after the time
of the death of said parties, and that while on one of these
said visits she gathered up such old papers, letters, etc., as
she found in the said house, with a view to going through
the same at some future date, but that due to the pressure
of other demands upon her, the said papers, etc., were for-
gotten; that when her belongings were shipped to Taylors,
S. C., in the Spring of 1921, these letters, papers, etc., were
packed with her said belongings and no further thought
was given by her to the same, until about the month of
March, 1922, after she had found certain letters that L.
Smiley Bigham had written her husband; that thereupon
she went through the said letters, papers, etc., and found
among them a certain typewritten statement, signed in
ink, "L. S. Bigham," and worded as follows, to wit:

"Mother and Margie had the two signed deeds that had disappeared in their possession. Causing trouble seems to be their pleasure. They took the money the P. O. Department had me charged with, and were the cause of Cleveland running off. And I had to pay the bond. For years I have had to leave home and pay board to be in peace to make my calculations and plats. They poisoned Father and tried to poison Leathea's child. After her death, when I found them with the deeds, I decided to kill the last one of them and leave no one to tell the tale. I am writing this to explain why I did this act. You will never see me again alive."

" 'Deponent further swears that she sent the said statement to A. L. King, attorney for E. D. Bigham, by registered mail.

" 'Personally appeared before me A. L. King of the Florence, S. C., Bar, who, being duly sworn, says that he is, and has been, counsel of record for Edmund D. Bigham, who was tried and convicted in the Court of General Sessions for Florence County of the murder of his brother, L. Smiley Bigham.

" 'That prior to the time of the trial of said E. D. Bigham, he (Bigham) mentioned to deponent that his brother, L. S. Bigham, had written him certain letters, from time to time, while he (E. D. Bigham) was living in South Georgia, which said letters would tend to establish that the family had urged him to move back to the old homestead, and also that said E. D. Bigham had a valid claim against the Bigham property, situated in Florence County, and also that his mother, his sister, and his brother had signed a deed to him, conveying certain portions of the said Bigham property to him; that the said E. D. Bigham stated that he was unable to recollect whether or not the said letters had been packed with his effects, when he shipped the same from South Georgia to Pamplico, S. C.; that he had requested his wife to search for the said letters and that

she had reported that she was unable to find the same; that he therefore assumed that the said letters had been destroyed along with other old letters, papers, etc., which were destroyed by him preparatory to his leaving Georgia.

"'Deponent further swears that on or about the 12th day of April, 1922, he received by registered mail, in an envelope hereto attached, and made a part hereof, 12 letters, all typewritten, and signed in ink, "L. S. Bigham," bearing dates as follows (same as in affidavits of E. D. Bigham and Mrs. May M. Bigham), and that he also received in the same envelope typewritten statement, without date, and signed in ink, "L. S. Bigham," and worded as follows, to wit: "Mother and Margie had the two signed deeds that had disappeared in their possession. Causing trouble seems to be their pleasure. They took the money that the P. O. Department had me charged with, and were the cause of Cleveland running off. And I had to pay the bond. For years I have had to leave home and pay board to be in peace to make my calculations and plats. They poisoned Father and tried to poison Leathea's child. After her death, when I found them with the deeds, I decided to kill the last one of them and leave no one to tell the tale. I am writing this to explain why I did this act. You will never see me again alive."'

"That accompanying the said letters and statement was a letter from Mrs. May M. Bigham, wife of said E. D. Bigham, to the effect that the said letters had been found at the time that certain household furniture had been unpacked, or words to like effect.

"That the said letters and statement have been in possession of deponent since he received them out of the said United States mail as aforesaid, and that the original thereof are annexed to this affidavit and made a part and parcel thereof."

The letters referred to in the foregoing affidavit are as follows, to wit:

"Jan. 3, 1917.

"Dear Edmund: I have been thinking of writing you for some time. We are all right. We have talked over putting in a mill and sawing up some of our timber and try to pay off your mortgage and other debts that we owe and stop interest; while lumber is bringing a good price we feel like we ought to apply a certain amount per thousand on what we owe you. What do you think would be right? We have thought about $2.50 per thousand feet. As we have other papers that we will have to take up. Will be glad to hear from you soon.

"Sincerely,          [Signed] L. S. Bigham."


"Jan. 12, 1917.

"Dear Edmund: I received your letter and was glad to hear from you. I am going to start sawing as soon as I can. I will send you a check for $250.00 for each hundred thousand feet, as I cut. I will keep account of it, as I sell and ship the lumber. As you said in your letter, we agree with you that we ought to cut our debts down and stop interest. We want you all to come over and see us, it has been so long since we were all together. Let us hear from you real soon.

"Sincerely,          [Signed] L. S. Bigham."


"July 1, 1918.

"Dear Edmund: Your letter received. I would like for you all to come over and spend a few weeks with us while Louise is here. It has been so long since we were together. Say, we want you all to move back over here so we can see and be with you all more often. I want you to think over buying enough of the land to take up your papers anyway. We are losing money every day. I am no farmer; you can make money farming, but I can't. We are all right. Let us hear from you soon.

"Lovingly,          [Signed] L. S. Bigham."

"June 10, 1918.

"Dear Edmund: I received your letter a few days ago. I will add the amount Cleveland owes you. I know that he owes you the money you claim and by my figures the interest on both papers amounts to $26,000.00. Say, what will you give me for the land with the timber excepted. I can't make as much on this place as the interest amounts to on what we owe you. I will want you to send me an order for the papers you turned over to attorneys for collection. Write soon.

"Lovingly,          [Signed] L. S. Bigham."

"Sept. 29, 1918.

"Dear Edmund: I received your letter of recent date and was glad to hear from you. I have closed the mill down and will not operate it any more. Before we put down the mill we promised to pay you so much per thousand on your mortgage, and we have not been able to make anything above expenses of operating it. Everything I try to do looks like I lose money. We are all well. Write and let me hear from you soon.

"Lovingly,          [Signed] L. S. Bigham."

"Oct. 12, 1918.

"Dear Edmund: I received your letter a few days ago. Why is it that you won't let us sell you enough interest in the land to take up your mortgage? I can't make enough on the land to pay the interest on what I owe you. I am no farmer, it takes all I can make surveying to pay expenses on the farm. After I sell the crop.

"Leathea was down here a few days ago. She wants to sell her interest and buy a house and lot. We want to sell you the whole place, that is, if you won't buy just enough to pay you. The lands have belonged to our family for nearly a hundred years and we rather sell to you than to any one else. I will have to do something to stop interest and I will have nothing. I realize that you have never

asked us for what we owe you, but I want to get square with the world. Write soon.

"Sincerely,               [Signed] L. S. Bigham."

"Oct. 23, 1919.

"Dear Edmund: Your letter received and was glad to hear from you. We can give you possession by January 1st or before, but you don't offer enough for the place. Lands have advanced four times what they were worth when you were here. We will divide the difference with you, between purchase price and what we owe you. You think it over. Remember your old friends, and that this is your old home and you ought to value it more than you do. You can make money here, but I am no farmer. Write soon.

"Lovingly,               [Signed] L. S. Bigham." ·

"May 5, 1920.

"Dear Edmund: I have been thinking I would write you for some time. We want you all to think it over and let us sell out to you and take up the mortgage. It will figure with interest up to July 7th, when it will be due, $30,126.40. Interest is going to eat up everything I have, unless I do something. I am worried over my affairs and will have to take up papers this fall that I had carried over, with the understanding that I would not ask for any further time. I never thought I would be embarrassed as I am. You can't realize my conditions as they are.

"Sincerely,               [Signed] L. S. Bigham."

"June 1, 1920.

"Dear Edmund: I received your letter a few days ago and was glad to hear from you all. I would like to see you and explain things to you. I could not get any fertilizer for the farm from any one, only by Bill going on my note with me. It hurts me to know that the average tenant can get fertilizer on credit, but I could not. They would tell

me that they would sell me for cash, or with good indorsement. I am going to declare bankruptcy and then my creditors will have to look out for themselves., You could buy these lands and save me from this embarrassment if you would. I am asking you to make me a fair offer for the land and relieve us of our burden. Let me hear from you as early as possible.

"Lovingly,        [Signed] L. S. Bigham."

"July 12, 1920.

"Dear Edmund: Your letter received. Was glad to hear from you. We have decided to take your proposition on all lands and lots at Pamplico except Pierce Finklea lands, giving possession November 1st. When can you come and fix up the papers? I am not going to be home much from now on. I can't make any money farming. The interest on what I owe you is more than I can make. We are well. Let me hear from you at an early date.

"Lovingly,        [Signed] L. S. Bigham."

"August 20, 1920.

"Dear Edmund: I am writing you to-day to tell you that we have taken up Cleveland's bond, so I have that cleared up. I am filling out deed to-day. I would like for you to come down here and look after the gathering of the crop for me as much as you can. I am off surveying nearly all the time and there is a good school that you can send your children to; and you won't have to change them from one school to another, and we all want you all to come down here now. Let me hear from you in regard to the above.

"Lovingly,        [Signed] L. S. Bigham."

"Oct. 29, 1920.

"Dear Edmund: I received your letter a few days ago. We went to Charleston and signed up the deed to you. I have the mortgage that you hold on the Estate lands and Pleasant Hill Church tract, of Kirton's lands figured to Nov. 1st. I thought you would have been back by that time.

It was the date we all agreed to turn the lands over to you and take up the mortgage of July 7, 1917, for $26,000 and interest from date, and square up my other debts and stop interest. Let me hear from you real soon.

"Sincerely,                    [Signed] L. S. Bigham."

The statement referred to in the foregoing affidavit is as follows, to wit:

"Mother and Margie had the two signed deeds that had disappeared in their possession. Causing trouble seems to be their pleasure. They took the money that the P. O. Department had me charged with and were the cause of Cleveland running off. And I had to pay the bond. For years I have had to leave home and pay board to be in peace to make my calculations and plats. They poisoned Father and tried to poison Leathea's child. After her death, when I found them with the deeds, I decided to kill the last one of them and leave no one to tell the tale. I am writing to explain why I did this act. You will never see me again alive.

[Signed] L. S. Bigham."

"Personally appeared before me J. B. Connaster, who, being duly sworn, says that he holds a professional certificate on penmanship, signed by C. P. Zaner, founder of the Zanerian College, Columbus, Ohio; that the Zanerian College is recognized as the finest penmanship college in the world; that he has been teaching penmanship in various business colleges for the past eight years, and for the past four years has been principal of the commercial department of Draughon's Business College, Columbia, S. C., which college has an average daily attendance of about 200 students; that his special duties are the teaching of penmanship and bookkeeping; and that, as instructor in these subjects, he devotes about seven hours each day to the examining of handwriting. He also says that he has carefully examined the indorsements on the back of checks, dated November 12 and 20, and December 17, 1920, drawn on the First

National Bank of Florence, S. C., payable to L. S. Bigham; that the indorsements on these checks are "L. S. Bigham"; and that in his opinion the person who wrote these signatures also wrote the signature on a series of letters, the first bearing date January 3, 1917, and the last bearing date October 29, 1920, and also wrote the signature on a type-written statement, without date, and that he. has placed his initials (JBC) on said letters, said statement, and said checks, as a means of identifying them."

"Personally appeared before me Wm. M. Gibbes, Jr., who, being duly sworn, says that he is cashier of the Palmetto National Bank of. Columbia, S. C.; that he has known J. B. Connaster for about four years; that he regards him as a man of high character and integrity; and that he believes that any opinion that said J. B. Connaster might give on a question of handwriting would be entitled to great weight."

"Personally appeared before me E. M. Singletary, who, being duly sworn, says that he has been clerk of the Court of general sessions and Court of common pleas for Florence County for the past 3½ years, and in such capacity he came into intimate contact with L. Smiley Bigham, deceased, who departed this life on or about the 15th day of January, 1921; that he is familiar with the handwriting of said L. Smiley Bigham; that he has carefully examined the signature appearing on a number of letters, the first of which is dated January 3, 1917, and the last of which is dated October 29, 1920, and also the signature on a typewritten statement, without date, and being worded as follows, to wit: 'Mother and Margie had the two blank deeds in their possession. Causing trouble seems to be their pleasure. They took the money that the P. O. Department had me charged with and were the cause of Cleveland running off. And I had to pay his bond. For years I have had to leave home and pay board to be in peace to make my calculations and plats. They. poisoned Father and

tried to poison Leathea's child. After her death, when I found them with the deeds, I decided to kill the last one of them and leave no one to tell the tale. I am writing this to explain why I did this act. You will never see me again alive,' with the signatures appearing on a number of checks drawn on the Farmers' & Merchants' Bank of Pamplico, S. C., and that he is of the opinion that the signatures on the said letters and on the said statement and on the said checks were written by one and the same person. Deponent further swears that he placed his initials (EMS) on the said letters, the said statement, and the said checks, as a means of identifying them."

"Personally appeared before me W. P. Meadows, who, being duly sworn, says that he is now assistant cashier of the Palmetto Bank & Trust Company of Florence, S. C.; that he has been employed in banking institutions for the past ten years, during which time he has filled the position of paying teller (for about four years); that he has carefully examined the signatures on a number of letters, signed in ink, 'L. S. Bigham,' also the signature on a certain typewritten statement, also signed in ink, 'L. S. Bigham'; that he has carefully examined and compared the signatures on the said letters and the said statement with signatures on a number of checks, drawn on the Farmers' & Merchants' Bank of Pamplico, S. C., and that he is of the opinion that the signatures on the said letters, the signatures on the said statement, and the signatures on the checks were all written by one and the same person. Deponent further swears that he has placed his initials (WPM) on the said letters, the said statement, and the said checks, as a means of identifying them."

"Personally appeared before me I. T. Welling, who, being duly sworn, says that he has been employed in the Carolina National Bank of Darlington, S. C., for the past 13 years, and now holds the position of cashier in said

Bank; that he has carefully examined and compared the signatures on a number of typewritten letters, signed in ink, 'L. S. Bigham,' and dated January 3, 1917, January 12, 1917, June 10, 1918, July 1, 1918, September 29, 1918, October 12, 1918, October 23, 1919, May 5, 1920, June 1, 1920, August 20, 1920, July 12, 1920, and October 29, 1920, also the signature on a certain typewritten statement, without date, also signed in ink, 'L. S. Bigham,' with signatures on a number of canceled checks, drawn on the Farmers' & Merchants' Bank of Pamplico, S. C., and signed, 'L. S. Bigham,' and that he is of the opinion that the signatures on the said letters, the signature on the said statement, and the signatures on the said checks were all written by one and the same person.

"Deponent further swears that he has placed his initials (ITW) on the said checks, the said statement, and the said letters, as a means of identifying them."

"Personally appeared before me H. M. Hill, who, being duly sworn, says that he has been employed in the Bank of Darlington, at Darlington, S. C., for the past 12 years, and now holds the position of assistant cashier in said bank; that he has carefully examined and compared the signatures on a number of typewritten letters, signed in ink, 'L. S. Bigham,' and dated January 3, 1917, January 12, 1917, June 10, 1918, July 1, 1918, September 29, 1918, October 12, 1918, October 23, 1919, May 5, 1920, June 1, 1920, August 20, 1920, July 12, 1920, and October 29, 1920, also the signature on a certain typewritten statement without date, and signed in ink, 'L. S. Bigham,' with the signatures on a number of checks, drawn on Farmers' & Merchants' Bank of Pamplico, S. C., and signed, 'L. S. Bigham,' and that he is of the opinion that the signatures on the said letters, the signature on the said statement, and the signatures on the said checks were all written by one and the same person.

"Deponent further swears that he has placed his initials (HMH) on the said checks, the said statement, and the said letters, as a means of identifying them."

"Personally appeared before me W. R. Willis, who, being duly sworn, says that he has been employed in the People's Bank of Darlington, S. C., for the past nine years, three years of which time he has been a paying teller; that he has carefully examined and compared the signatures on a number of typewritten letters signed in ink, 'L. S. Bigham,' and dated January 3, 1917, January 12, 1917, June 10, 1918, July 1, 1918, September 29, 1918, October 12, 1918, October 23, 1919, May 5, 1920, June 1, 1920, August 20, 1920, July 12, 1920, and October 29, 1920, also the signature on a certain typewritten statement, without date, also signed in ink, 'L. S. Bigham,' with the signatures on a number of canceled checks, drawn on the Farmers' & Merchants' Bank of Pamplico, S. C., and signed, 'L. S. Bigham,' and that he is of the opinion that the signatures on the said letters, the signature on the said statement, and the signatures on the said checks were all written by one and the same person.

"Deponent further swears that he has placed his initials (WRW) on the said letters, the said checks, and the said statement, as a means of identifying them."

"Personally appeared before me R. C. Rollins, who, being duly sworn, says that he has been employed in the Bank of Timmonsville, at Timmonsville, for the past 20 years and now holds the position of vice president in said bank; that he has carefully examined and compared the signatures on a number of typewritten letters, signed in ink, 'L. S. Bigham,' and dated as follows, to wit, January 3, 1917, January 12, 1917, June 10, 1918, July 1, 1918, September 29, 1918, October 12, 1918, October 23, 1919, May 5, 1920, June 1, 1920, August 20, 1920, July 12, 1920, and October 29, 1920, also the signature on a certain typewritten statement, without date, also signed in ink, 'L. S. Bigham,' with the signa-

tures on a number of canceled checks, drawn on the Farmers' & Merchants' Bank of Pamplico, S. C., and signed, 'L. S. Bigham,' and that he is of the opinion that the said signatures on the said letters, the signature on the said statement, and the signatures on the said checks were all apparently written by one and the same person.

"Deponent further swears that he placed his initials (RCR) on the said statement, the said letters and the said checks."

"Personally appeared before me H. M. Pleasants, who, being duly sworn, says that he has been cashier of the Farmers' & Merchants' Bank of Pamplico, S. C., for about two years, and that L. Smiley Bigham carried an account with the said bank; that eight canceled checks, dated as follows, to wit, December 22, 1920, December 23, 1920, December 14, 1920, December 22, 1920, December 11, 1920, December 13, 1920, December 18, 1920, December 11, 1920, all bearing the signature of L. S. Bigham, were paid by said bank, in due course of business, and that the signatures on said checks are all genuine signatures of said L. S. Bigham.

"Deponent further swears that he handled a check, dated December 17, 1920, drawn by E. D. Bigham to L. S. Bigham, on the First National Bank of Florence, S. C., and paid through said Farmers' & Merchants' Bank of Pamplico, S. C., and that the indorsement ('L. S. Bigham') appearing on the back of said checks is the genuine signature of said L. S. Bigham."

"Personally appeared before me C. M. Wilkinson, who, being duly sworn, says that he has been employed as the agent of the Seaboard Air Line Railway Company, at Pamplico, S. C., for the past two years or longer, and that L. Smiley Bigham, deceased, was a frequent visitor to his office; that he frequently came into his said office and used a typewriter; that he had various business transactions with said L. Smiley Bigham; that he has frequently seen him .

write his name, and that he has in his office several specimens of his signature and that he is familiar with the same; that he has examined the signatures on three letters, dated June 1, 1920, June 12, 1920, and Oct. 29, 1920, all bearing the signature, 'L. S. Bigham,' and that it is his opinion that the signatures on the said letters are the genuine signatures of said L. Smiley Bigham, and that he has placed his initials (CMW) on the said letters, as a means of identifying them.

"Deponent further swears that the records of his office show that six carloads of wood were shipped from Pamplico, S. C., in the months of December and January, 1920, and 1921, in the name of E. D. Bigham."

"Personally appeared before me Clarence M. Rose, now employed on the city police force of the City of Florence, S. C., who, being duly sworn, says that he was an officer under the sheriff of Florence County at the time that the Bigham family were killed at the Bigham home, in said county and state; that he knows of his own knowledge that on the Sunday following the said homicide three or more empty pistol cartridges were picked up in the yard to the said Bigham premises; that the said cartridges were of 38-caliber, and similar to the empty cartridge found in the pistol that was found in Smiley Bigham's hands.

"Deponent further swears that he is of the opinion and belief that the said cartridges were turned over to the coroner of Florence County. Deponent further swears that he was a witness for the state in the case against Edmund D. Bigham, and that he was not asked anything concerning the facts as above set out, and that he gave no evidence concerning the same, and that it is his opinion and belief that no evidence was given concerning this fact by any other witness.

"Deponent further swears that according to his best knowledge, information, and belief, the attorneys conducting the defense for said Edmund D. Bigham were never informed of the fact that the said empty cartridges were found, as aforesaid, until some time after the said trial."

"Personally appeared before me J. G. Miller, who, being duly sworn, says that he is a resident of the City of Florence, County and State aforesaid; that he lived in the vicinity of what is known as the 'Bigham home,' near Pamplico, S. C., for several years, at which time he was engaged in operating sawmills; that he knew Smiley Bigham (for whose murder Edmund D. Bigham was tried and convicted) ; that he does not know said Edmund D. Bigham; that he has no interest whatsoever in the case of the *State v. Edmund D. Bigham;* that during the time he was engaged in business near the said Bigham plantation, he came in intimate contact with said Smiley Bigham, seeing him every day or two, and that he knows of his own knowledge that said Smiley Bigham was addicted to the use of alcoholic liquor, and that he was subject to 'spells,' during which time he was irresponsible and, in deponent's opinion, dangerous; that some time during the fall of 1920 he (deponent) called upon said Smiley Bigham at the said Bigham premises for the purpose of inspecting a sawmill which was located on said premises, which said sawmill the said Smiley Bigham had offered for sale; that as the agent of ———— he inspected the said sawmill, and the said Smiley Bigham agreed to sell the said sawmill to said ———— for the sum of $1,200; that it was thereupon agreed that the said Smiley Bigham would meet deponent and the said ———— on the following day, in Florence, S. C., and receive payment for the said mill; that on the said day, as deponent was going from his home at No. 128 West Evans Street, in said City of Florence, just as he approached the F. & M. Bank Building, he met the said Smiley Bigham coming toward him, walking rapidly and apparently greatly perturbed; that he immediately stated to deponent as follows, to wit: 'Mr. Miller, about that sawmill I agreed to sell your friend yesterday: I can't let you have it. My family is worrying me so much, trying to steal everything I have, but before I will let them do it, I will kill the last God damned one.' That as said Smiley

Bigham made this statement he showed by his expression and general demeanor that he was in dead earnest; that deponent admonished the said Smiley Bigham 'not to do anything like that,' or words to like effect, and, then, after a few words, parted with him. That deponent was not a witness at the trial of Edmund D. Bigham; that he never mentioned about this conversation with said Smiley Bigham, except possibly to his (deponent's) wife; that some time after the trial he said something about it to parties, the names of whom he cannot now recall. That this affidavit is made at the request of A. L. King, attorney for said E. D. Bigham, who was not acquainted with deponent until he called upon deponent for the purpose of investigating this matter on the 7th day of May, 1922; that this affidavit is made freely and voluntarily, and that deponent has not been promised any reward by any person or persons whomsoever, and that he has no hope of any reward for such action.

"Deponent further swears that, according to his best knowledge, information, and belief, Edmund D. Bigham was not living at the Bigham home at the time the said Smiley Bigham made the statement to him, as aforesaid."

"Personally appeared before me W. T. 'Bill' Hyman, who, being duly sworn, says that he is a resident and citizen of the county and state aforesaid; that he resides at Pamplico, in the said county and state; that he was residing there during the year 1920; and that during the said year he indorsed a note or notes for L. Smiley Bigham, deceased, to enable him to obtain fertilizers."

"Personally appeared before me Jim Cain, who, being duly sworn, says that he is a resident and citizen of the County of Florence, state aforesaid, and brother of Bogan Cain, who married Leathea Bigham, deceased; that he resides in the section of said County in which is located the former home of L. Smiley Bigham; that he knew, intimately, all members of the Bigham family including Edmund D.

Bigham; that during the fall of 1920, about one month after the said E. D. Bigham returned to this Section of Florence County to live, he (deponent) met the said Mrs. Margery Bigham Black, and during a conversation with her, in which he (deponent) remarked that he was glad to hear that Edmund was back home, and the said Mrs. Black replied: 'Yes, we had to send for Edmund to come home for our protection.' "

The following affidavits (omitting caption and jurat) were presented by the state, to wit:

"Personally appeared before me J. G. Miller, who, being first duly sworn, says that he has heard read the affidavit made by him on the 8th day of May, 1922, in regard to Smiley Bigham; that as stated therein it is in substance true; that the remark made by Smiley Bigham as stated in the said affidavit was made some six or seven months prior to his death and that at the time he made this statement deponent does not know whether he was drinking or not, but he might have been drinking, and deponent admonished with him for the reason that he thought at the time Smiley was laboring under some disappointment by not being able to sell the property which he said was his. That during deponent's acquaintance with Smiley Bigham, he never saw him do anything that would lead deponent to believe that he would harm any one, and deponent gave no credence to his statement other than that arising from an excited mind. That the day mentioned in his affidavit as to the trade for the sawmill, deponent dined at the Bigham home, and that Smiley, together with his mother and sister, were present, and that they were as pleasent as any people he had ever seen. That deponent had occasion for years to pass and repass the Bigham home and saw Smiley, his sister, and mother, and that their relationship was always cordial, friendly, and there was no indication that there was any trouble between any of them."

"Personally appeared before me R. A. Black, who, being first duly sworn, says: That in the month of October, 1912, he married Marjorie A. Black, a sister of L. Smiley Bigham and of Edmund D. Bigham. That for about three years, 1916, 1917, and 1918, this deponent lived within the Bigham home and upon the Bigham lands. That in 1918 he was made health officer for the City of Florence and so continued until January 1, 1920, when he took up his residence with his brother-in-law, J. B. Cain, also the husband of one of the Bigham daughters, in the County Jail at Florence, where the said L. Smiley Bigham spent a great deal of his time with this deponent and the said J. B. Cain, and so continued until the death of Mrs. Cain, after which time this deponent continued as deputy sheriff, and the said L. Smiley Bigham returned to his home at Pamplico. That all during the time from 1915 until the death of Mrs. Cain in 1920, this deponent was in close, personal, and intimate friendly relationship with the entire family, and was thoroughly conversant and familiar with the transactions and affairs of the family, and particularly with reference to the lands, estate, property, and indebtedness. That the statements attributed to L. Smiley Bigham and the letters upon which Edmund D. Bigham is basing his motion for a new trial with reference to the indebtedness of from $26,-000 to $30,000 are utterly absurd and wholly inconsistent with the fact. That deponent knows that the said Edmund D. Bigham disposed of all of his interest in the Bigham property before he left Florence County and went to live in Greenville, from where he moved in 1913 to the State of Georgia, and on the other hand, the said Edmund D. Bigham was indebted to the wife of this deponent, Mrs. Marjorie A. Black, to the amount of at least $800, with interest for several years. That this deponent has never heard of any claim made by the said Edmund D. Bigham of any member of the family being indebted to him with the exception of the mortgage for $400 given him by Dr. Grover

Cleveland Bigham, which mortgage Mrs. M. M. Bigham paid in the year 1918.

"As a member of the Bigham family, this deponent knows that a few months prior to the killing, for which Edmund D. Bigham has been convicted, the said Smiley Bigham telegraphed him $350 with which to straighten up his affairs in Georgia and to move to South Carolina; that the funds were telegraphed through the Bank of Pamplico, of which J. W. Gregg was cashier.

"That as a member of this family, deponent knows that there was no dispute in the family about the respective rights and interests of Mrs. Bigham, the mother, Mrs. Black, and L. Smiley, as between themselves they were in absolute harmony and agreement as they were also with Mrs. Cain, the wife of J. B. Cain. That shortly after her death a disagreement arose between J. B. Cain, on the one hand, and the other members of the family, on the other hand, with reference to how much of the Bigham land the said J. B. Cain and his child should have and receive, and at that time the said Edmund D. Bigham came to South Carolina and made the statement to this deponent, in the presence of the said J. B. Cain, that he had absolutely no interest in the matter, but that he was so anxious to have it settled he would spend all that he had to accomplish that result. That the said L. Smiley Bigham was so slow and imperfect in his handling of the typewriter that he frequently called upon this deponent to do his writing for him, and by this means deponent became thoroughly conversant with his vocabulary and style and manner of expression, and that this deponent has read with interest and amazement the series of letters dated from January 3, 1917, until October 29, 1920, purporting to have been written by the said L. Smiley Bigham, and that this deponent has no hesitation in saying that in all of his experience with the said L. Smiley Bigham he has never known him to express himself in the manner contained in the said letters.

"That the originals of the said letters have been displayed to him, and that during the period of time that they purport to have been written this deponent knows of his own knowledge that the said Smiley Bigham was not sufficiently expert in the use of the typewriter to have typed, punctuated, and expressed himself as therein set forth; and, on the contrary, because of his inefficiency in that regard, he frequently called upon this deponent to do his writing for him, and this deponent avers that he never wrote any of the letters set forth in the motion of Edmund D. Bigham for a new trial. That in the letter dated January 3, 1917, in which the said L. Smiley Bigham was made to say, 'We have talked over putting in a mill and sawing up some of our timber and try to pay off your mortgage and the other debts,' that this deponent recalls that the said L. Smiley Bigham for some time previous thereto had been operating a sawmill on said land cutting the timber, and disposing of the lumber. That deponent has made a careful comparison of the handwriting on the letters alleged to have been written by the said L. Smiley Bigham, and from having seen him sign his name many times and having many specimens of his handwriting in his possession, this deponent avers that in his opinion the said signatures are not the genuine signatures of the said L. Smiley Bigham, and, on the contrary, in his judgment and opinion, are counterfeit and forged."

"Personally appeared before me D. Gordon Baker, who, being first duly sworn, says that he has read in a letter purporting to be signed by L. S. Bigham, in which it is stated referring to 'Mother and Margie,' that, 'they took the money that the P. O. Department has me charged with,' from which it would appear that L. S. Bigham was worrying concerning the same; that if this letter was written after September, 1920, there was nothing at that time for L. S. Bigham to have been alarmed or worried about with reference to this matter, since the statute of limitations had run against either a civil or criminal action being brought against him,

and L. S. Bigham had been so advised by deponent both
verbally and in writing; that it is the deponent's recollec-
tion that upon a preliminary hearing the only deficit the gov-
ernment showed was less than a dollar, this being easily
explained by L. S. Bigham in an unsworn statement and the
commissioner promptly dismissed the prosecution."

"Personally appeared before me J. Bogan Cain, who, on
oath, says that he is a resident and citizen of the County of
Florence, S. C., of the age of 37 years, and that he is the
surviving husband of the late Leathea Bigham Cain, who
was a sister of the defendant, Edmund D. Bigham; that
this deponent married the said Leathea Bigham in the year
1914, after having lived in the neighborhood of the Bigham
home all of his life. That from the year 1914 up until the
death of his wife which occurred on the 11th day of Febru-
ary, 1920, this deponent was forced into an intimate, per-
sonal, and detailed knowledge of the affairs of the Bigham
family, especially as it related to the lands and indebtedness
thereof and upon the same. That he knows of his own
personal knowledge that neither the said L. Smiley Bigham,
nor any member of the Bigham family, owed the said Ed-
mund D. Bigham the sum of $26,000 or any other sum
secured by a mortgage upon the lands or any part thereof,
with the exception of $400 that Grover Cleveland Bigham
owed to his brother Edmund D. Bigham, and which their
mother, Mrs. M. M. Bigham, paid during the year 1918,
which payment, according to the recollection of this de-
ponent, was made through the office of Willcox & Willcox,
with whom the said Edmund D. Bigham had placed the
$400 paper for collection.

"That this deponent has heard read the series of letters
upon which the said Edmund D. Bigham bases his motion
for a new trial in this case, all of which are in typewriting
with the written letters and words 'L. S. Bigham' appended
thereto. Deponent has not had an opportunity to see the
originals; but this deponent avers that although he was

intimately associated with the said L. S. Bigham from the
time of his marriage into the family until the death of the
wife of deponent a period of six years, the said L. S. Big-
ham would either get the wife of deponent or his brother-
in-law, R. A. Black, to do his typewriting for him because
of the slowness with which he used a typewriter, and the
imperfections in the writing. Therefore this deponent
avers that it is inconceivable to him that the said L. S. Big-
ham should have written the series of letters and the state-
ment referred to in the motion for a new trial in this case, as
set forth in the record. That this deponent lived in the
County Jail at Florence from the latter part of the year
1917 to the end of the year 1920, during which time the
said L. Smiley Bigham spent a great deal of his time at the
jail as the guest of this deponent and his wife, and that the
wife of deponent and his brother-in-law, R. A. Black, at-
tended to the correspondence of the said L. S. Bigham,
sometimes writing for him on the typewriter, but that the
said L. S. Bigham conducted his correspondence upon let-
ter heads upon which there was printed the name of the
said L. S. Bigham, with advertisements that he was a dealer
in yellow pine lumber, farmer, and Civil Engineer printed
thereupon, and when stationery of this character could not
be obtained, that the correspondence was conducted upon the
letter heads of Sheriff Thomas S. Burch, the sheriff of
Florence County. That this deponent, having been so in-
timately associated with his brother-in-law over said period
of years and knowing his vocabulary and style and method
of expression, is convinced that the said L. S. Bigham
neither wrote nor dictated the letters or statement contained
within the record for the motion for new trial in his case,
because the same is both contrary to his method of expres-
sion either in talking or writing; and that all of the letters
written by the said L. Smiley Bigham to the wife of this
deponent whenever occasion would arise for the writing of

a letter would style himself 'Your brother,' and never formally subscribe his name, 'L. S. Bigham.'

"That according to the best recollection of this deponent the sawmill referred to in the alleged correspondence was put upon the lands and operated first either the last part of the year 1915 or during the year 1916. That. the alleged statements of the said L. Smiley Bigham with reference to conveying the Bigham lands to the said Edmund D. Bigham in satisfaction or cancellation of an alleged indebtedness to the said Edmund D. Bigham of $26,000 or $30,-000 are both preposterous and impossible of performance, because at the time these alleged letters purport to have been written, the title to five-sixths of all the property was vested in the wife of this deponent, the other one sixth being in the name of Mrs. Margie A. Black at that time. That never since this deponent has been a member of the Bigham family by marriage has any member of the family ever admitted owing the said Edmund D. Bigham any sum of money other than the $400 due by Dr. Grover Cleveland Bigham, and never, until after the death of the whole family, did the said Edmund D. Bigham ever make any such claim, so far as this deponent knows or is informed or believes. That after the death of the wife of deponent and the controversy which arose between him and the other members of the family as to the ownership of the land, the said Edmund D. Bigham came to Florence to see this deponent, and on more than one occasion discussed the details of the whole transaction with deponent, yet never at any time did he make any claim to any interest therein, lien thereupon, or indebtedness from any member of the family to him. That this deponent vigorously and positively denies that at any time Mrs. Dora M. Bigham, or Mrs. Margie A. Black, either or both, jointly or severally, tried to take the life of his child, and on the contrary their devotion to the child was manifest, and this deponent would have intrusted his said child to their safe-keeping at any time or under any circum-

stances. This deponent further avers that there was no typewriter in the Bigham home at any time since he married into the family in 1914."

"Personally appeared before me R. Kennedy Rutledge, who, being first duly sworn, says that he is a resident and citizen of the City and County of Florence, S. C., and is now 36 years of age; that in the year 1910 this deponent became employed by the First National Bank of Florence as clerk; that since that time he has discharged the duties of book-keeper, pay and receiving teller, and cashier, and that he is now active vice president, that during the time this deponent has been connected with the First National Bank he has known the late L. S. Bigham and has handled sundry banking transactions for the bank with the said deceased, L. S. Bigham; that deponent has seen the said L. S. Bigham on sundry occasions sign his name and is, therefore, familiar with the same; that he has carefully compared the signatures on the checks produced by the defendant on a motion for new trial with the signatures appearing upon the letters and statement also produced by the defendant on his motion for a new trial, and in the opinion and judgment of this deponent the signature upon the letters and statement are not the same nor made by the same hand or person as those appearing upon the checks. The said deponent reaches this conclusion and expresses this conviction upon the following reasons, that is to say:

"It appears that the signatures on the letters and statement were made slowly and painstakingly, in contradistinction with the freehand movement indicated by the signatures upon the checks; that the signatures on the checks are written light and fine, while the signatures on the letters are written heavy with thick strokes. The characteristics of the 'S' and 'G' in the letters are very materially different from those appearing on the checks; while it is also apparent that the tail of the last loop of the 'M' on the checks appears to go up and naturally end or terminate, while the 'M' in

the letters is brought to an abrupt termination on a line with the bottom of the 'M.' That the individual letters in the signature of the typewritten letters and typewritten statement are fully and completely formed, in contradistinction to the hurried freehand and incomplete formation of the letters appearing upon the checks. That from the knowledge of this deponent of the said L. S. Bigham, by observing his arm movement in writing his name, it is the judgment, opinion, and conclusion of this deponent that the signatures appearing in the letters and written statement offered by the defendant on his motion for a new trial are not the genuine signatures of the said L. Smiley Bigham, but are counterfeit and forgeries."

"Personally appeared before me Sam H. Husbands, who, being first duly sworn, says that he is now 31 years of age and is now and for the past one and one-half years has been cashier of the First National Bank of Florence, S. C., with which institution he has been connected for the past 13 years, during which time he has occupied various positions as receiver and paying teller and bookkeeper. That the late L. S. Bigham had sundry banking transactions with the First National Bank and necessarily a considerable amount of correspondence passed between the bank and the said L. S. Bigham. That although this deponent has gone through the files of the bank containing the correspondence he is unable to find and so far as he knows there has never been received by the bank any letter from the said L. S. Bigham made on and with a typewriter and on the contrary all of the letters found are written in longhand. That on the 18th day of October, 1919, the bank received from the said L. S. Bigham a letter upon a letterhead with the words, 'L. S. Bigham, Surveyor and Civil Engineer, Pamplico, S. C.,' with date line printed thereon. That this deponent does not recall that he ever saw the said L. S. Bigham sign his name, but that from handling the transactions of the said L. S. Bigham he is familiar with his signature. That he

has carefully· compared the signatures on the checks produced by the defendant on a motion for new trial, with the signatures appearing upon the letters and statement also produced by the defendant on his motion for a new trial, and in the opinion and judgment of this deponent the signatures upon the letters and statement are not the same nor made by the same hand or persons as those appearing upon the checks. The said deponent reaches this conclusion and expresses this conviction upon the following reasons, that is to say:

"It appears that the signatures on the letters and statement were made slowly and painstakingly, in contradistinction with the freehand movement indicated by the signatures upon the checks. That the signatures on the checks are written light and fine, while the signatures on the letters are written heavy with thick strokes. The characteristics of the 'S' and 'G' in the letters are very materially different from those appearing on the checks; while it is also apparent that the tail of the last loop of the 'M' on the checks appears to go up and naturally end or terminate, while the 'M' in the letters is brought to an abrupt termination on a line with the bottom of the 'M.' That the individual letters in the signatures of the typewritten letters and typewritten statement are fully and completely formed, in contradistinction to the hurried freehand and incomplete formation of the letters appearing upon the checks."

"Personally appeared before me W. P. Meadows, who, being first duly sworn, says that he is the same person who signed an affidavit for A. L. King, Esq., with reference to the signatures of L. S. Bigham, exhibited to this deponent by the said A. L. King, Esq., on certain checks and certain letters. This deponent desires further to say in connection therewith that he was wholly unfamiliar with the handwriting or signature of the said L. S. Bigham; that he did not know the man personally, does not recall ever having seen him, and had never seen him write his name or anything

else; that the statement made by this deponent was based upon a comparison of the signatures on the checks exhibited and certain of the letters and statement exhibited solely and entirely, and that the said checks and letters were exhibited to deponent on one day, and he looked them over for 10 or 15 minutes and advised Mr. King that he would later sign the affidavit, expressing his opinion; that on the following morning for 10 or 15 minutes he again compared the signatures and signed the affidavit."

"Personally appeared before me E. O. White, who, being first duly sworn, says that he is now, and was during the year 1920, superintendent of the public schools at Pamplico, in Florence County, S. C. That deponent has seen a letter purporting to have been written by L. Smiley Bigham to Edmund D. Bigham, under date of October 29, 1920, and has heard read the affidavit of Mrs. May M. Bigham, the wife of the said E. D. Bigham, which attempts to show that the said letters were received by the said E. D. Bigham in South Georgia. That deponent recalls that the said E. D. Bigham, his wife and two daughters were in Pamplico and at the school, of which this deponent was superintendent, just about the time that the same opened during the month of September, 1920."

"Personally appeared before me W. T. Hyman, who, being first duly sworn, says that on last Friday, the 2d day of June, 1922, A. L. King, Esq., attorney for the defendant, E. D. Bigham, requested this deponent to sign an affidavit stating that he had indorsed a note or notes for L. S. Bigham, deceased, and without going into the details of the transaction deponent signed the affidavit. The facts with reference to the transaction mentioned in the affidavit made by this deponent, at the request of Mr. A. L. King, are as follows:

"That for some eight or ten years this deponent has been selling L. Smiley Bigham, deceased, fertilizer. That in the year 1919 this deponent, in the usual course, sold the said

L. Smiley Bigham fertilizer, and that, according to the recollection of deponent, the said Smiley Bigham used his money, realized from the sale of his crops in 1919, to make an initial payment on the tract of land which he had bought from H. Pearce Finklea. That in the year 1920 the said L. Smiley Bigham, as was his custom, applied to this deponent for fertilizers, which this deponent readily sold him, charging the same on open account on his books. That when the time for the payment of the fertilizer arrived, May 1, 1920, the said L. Smiley Bigham requested this deponent to carry the same until the fall, which this deponent agreed to do upon a note or notes of the said L. Smiley Bigham, the indorsement of his sister, Mrs. Margarie A. Black, and in forwarding the notes to the Navassa Guano Company of Wilmington, N. C., this deponent himself indorsed the same. That when the notes came due the said L. Smiley Bigham wanted to hold his 1920 cotton for a better price, and this deponent arranged for the time of payment to be extended. When the first of the two notes again matured, the said Smiley Bigham paid the same, and before the second came due he was dead.

"That this deponent lives within about two miles of the Bigham home and was perhaps the most intimate friend and acquaintance of the family in the neighborhood and he was frequently with them and they with him. That he has heard read the alleged letters supposed to have been written by the said L. Smiley Bigham, wherein he stated, among other things, 'For years I have had to leave home and pay board to make my calculations and plats,' and this deponent avers that he never has known the said L. Smiley Bigham to reside or board in any other place than his own home, where he resided, so far as deponent knows, in peace, harmony, and love with his entire family. That the statement in said letter, 'causing trouble seems to be their pleasure,' set forth in the said alleged writing, has also been called to the attention of this deponent, and he avers that if there was ever

any trouble between the said L. Smiley Bigham, his mother and sister, Mrs. Margarie A. Black, that he never heard of it, and on the contrary was always impressed with the degree of harmony and good feeling that existed among and between them. That this deponent has an old Remington typewriter at home. That sometimes the said L. Smiley Bigham would attempt to use the same, but his progress was so slow and his writing so imperfect that it is inconceivable to this deponent that he should have attempted to compose any letter or document upon the same. This deponent has also seen the said L. Smiley Bigham attempt to pick out words on the typewriter at the depot at Pamplico, with the same results, and it is a fact that the writing of the said Smiley Bigham on the typewriter was very slow and imperfect. That this deponent recalls that when he was selling certain timber to a Mr. Miller and the said L. Smiley Bigham, that when they came to close the transaction they brought R. A. Black, a brother-in-law of the said L. Smiley Bigham, with them to do the typewriting, and that the papers that were then drawn were typewritten by the said R. A. Black. That after having known the said Bigham family and L. Smiley Bigham for more than 35 years, and been their intimate associate and friend, and knowing the facts to be contrary to those set forth in the alleged instrument of writing, this deponent solemnly swears that he does not believe that the same was written by the said L. Smiley Bigham, and if it appears what purports to be his signature, he is convinced the same is clearly counterfeit or forgery."

"Personally appeared before me H. M. Pleasant, who, being first duly sworn, says that at the request of A. L. King, Esq., he signed an affidavit as to the genuineness of the signature of L. S. Bigham upon certain checks exhibited by the said King to deponent, that since that time he has compared the signatures appearing on the said checks, some of which he saw the said L. S. Bigham sign, with the signatures appearing on the letters upon which the said Edmund

D. Bigham is basing his motion for a new trial, and that while this deponent has had only six years' experience in banks, he feels qualified from his experience with handwriting and with the particular signature of the said L. S. Bigham to say that in his opinion said letters do not contain the genuine signature of the said L. S. Bigham, and he says this for the following reasons: That the general characteristics of the signatures are materially different by comparison to each other upon the said letters and by comparison with the signatures which he saw the said L. S. Bigham make; that one of the characteristics of the writing of the said L. S. Bigham, so far as observed by this deponent, was that it was generally lightly written and fine, while the signatures appearing on the letters are for the most part heavy and strokes broad; that there was a peculiar characteristic in the manner in which the said L. S. Bigham made the tail of the letter 'G' in his name, and it is patent to this deponent that the attempt to reproduce the same character on the letters is either by tracing or in a slow deliberate manner indicative of an attempt to counterfeit; that an inspection of the tail to the last loop in the letter 'M' as made by the said L. S. Bigham on the checks bearing his signature and made in the presence and view of this deponent are altogether different in form and character from the same formation on the letters; that deponent expresses as his conviction and belief said signatures on the said letters are not the genuine signatures of the said L. S. Bigham."

"Personally appeared before me M. B. Purvis, who, being duly sworn, says that he is a citizen and resident of the town of Timmonsville, County of Florence, S. C., and is now 48 years of age; that this deponent was personally acquainted with the late Smiley Bigham, and during the month of September or October, 1916, sold to L. Smiley Bigham a certain engine and boiler with which to operate a sawmill. This deponent received from the said L. Smiley

Bigham several letters in regard to the transaction, none of which were in typewriting, but all of which were written out in full in longhand writing of the said L. Smiley Bigham."

"Personally appeared before me C. L. Farmer, who, being duly sworn, says that he is a resident of Florence County and lives in the City of Florence. That during the year 1920 deponent run a boarding house in the City of Florence, and that he was well acquainted with L. S. Bigham, who stopped at his boarding house when in the City of Florence. That during the latter part of November, 1920, or December 1, 1920, the said L. S. Bigham was at deponent's house and had a talk with deponent, and Smiley said he was always anxious to be at home and was not satisfied to be away from home, because he feared Edmund would do some harm to his mother and sister. On another occasion Smiley Bigham told deponent that he had to go up in North Carolina to close up some business with Greensboro Land Company, but could not stay away from home because Edmund was threatening his mother and sister on account of the property, and he feared Edmund would do them some harm. The last night Mr. Bigham spent in my home he said he was so uneasy about his mother and sister that he could not sleep thinking about it, and did get up some time after midnight and got a transfer and went home and returned early next morning. Mr. Bigham was always talking about some trouble between Edmund and his sister, Margie, and his mother, and said he was uneasy all the time he was away from home fearing Edmund would do something to them and he not be present to protect them."

*Messrs. A. L. King, C. T. McDonald* and *Mendel L. Smith,* for appellant, cite: *New trial on after-discovered evidence:* 104 S. C., 356; 108 S. C., 295.

*Mr. L. M. Gasque, Solicitor,* for the State, cites: *Motions for new trial on after-discovered evidence are directed*

*to the discretion of the Court:* 25 S. C., 174; 15 S. C., 547; 25 S. C., 147; 16 S. C., 624; 87 S. C., 152; 14 S. C., 432; 51 S. C., 405; 95 S. C., 474; 33 S. C., 401.

April 3, 1923.

The opinion of the Court was delivered by MR. CHIEF JUSTICE GARY.

There are five exceptions which we will proceed to consider in their regular order.

### FIRST EXCEPTION

The reason stated by his Honor the Circuit Judge for refusing to hear the evidence mentioned in this exception, was that it was not newly discovered, but could have been presented at the time of the trial. The reason which he assigned is satisfactory to this Court.

It is only necessary to refer to the testimony of Edmund D. Bigham, the defendant, which we have italicized, to show that this exception cannot be sustained.

### THIRD EXCEPTION

The findings of fact by his Honor the Circuit Judge are not reviewable by this Court. Therefore the question whether his finding that the unaddressed and undated paper alleged to have been signed by L. S. Bigham was contrary to the overwhelming weight of the testimony presented to him is not properly before this Court for consideration, except in so far as it may tend to show that his discretion was erroneously exercised. The appellant's attorneys have failed to satisfy this Court that the discretion of the presiding Judge was erroneously exercised; therefore this exception must be overruled.

### FOURTH EXCEPTION

For the reasons already stated, this exception cannot be sustained.

## FIFTH EXCEPTION

What has been said in considering the other exceptions is conclusive of this exception. In conclusion, we shall call attention to a few leading facts that point strongly to the guilt of the defendant.

The question whether the discretion of his Honor the Circuit Judge was erroneously exercised must be determined, not only under the testimony heard upon the motion for a new trial on the ground of after-discovered evidence, but, likewise, upon the testimony introduced at the trial for murder.

The testimony fails to show that any one except Edmund D. Bigham had a motive for the murder of the whole family.

The testimony tends to show that many of the physical facts alleged in the letters were untrue.

It is unreasonable to suppose that L. S. Bigham would have made the unaddressed and undated paper, alleged to have been signed by him, if he had intended to kill the whole family; or that he would have secreted it in such a manner as, in all probability, would prevent its discovery.

The letters and the paper containing the threat to murder the whole family have, in many respects, the earmarks of fabrications.

It is the judgment of this Court that the appeal be dismissed, and the case remanded to the Circuit Court, for the purpose of having a new day assigned for carrying into execution the sentence of the Court imposed on the defendant.

MESSRS. JUSTICES FRASER and MARION concur.

MR. JUSTICE COTHRAN dissents.

MR. JUSTICE WATTS did not sit.

MR. CHIEF JUSTICE GARY: I cannot but think that the evidence relied upon was of vital import; that, if true, the result might have been different; and that the defendant

was entitled to have the issue of its truth passed upon by a jury.

MR. JUSTICE MARION :   The defendant stands convicted, in accordance with the forms of law, of a crime which was part of a strange and terrible tragedy.   There are obvious considerations which influence to the exercise of conscientious care in passing upon any question that may be decisive of the fate of this appellant.   The question here presented, and with which our only responsible concern is the correct judicial solution, is whether this Court, restricted by constitutional limitation in such case to the correction of errors of law, may properly pronounce Judge Shipp's action in refusing the motion for new trial on after-discovered evidence to be reversible error.   To the Circuit Judge in such matters the law commits the determination of all issues of fact.   Unless his findings of fact were influenced or controlled by error of law, or unless his conclusion based thereon was so illogical and unreasonable as to amount to manifest abuse of discretion, his action is final and may not be overruled by this Court.   After careful consideration I am clearly of the opinion that the appeal record fails to disclose either that Judge Shipp's findings of fact were influenced or controlled by error of law or that his conclusion amounted to such abuse of discretion as would warrant this Court in setting aside his order.   I therefore concur in the opinion of the Chief Justice.